IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

**PARCO MERGED MEDIA CORP.,**

      Plaintiff,

   v.                                                CIVIL ACTION NO.  2:06cv46

**MULTISPECTRAL SOLUTIONS, INC.,**

      Defendant.

*MEMORANDUM OPINION AND ORDER*

Before the Court are several motions filed by both parties.  Defendant Multispectral Solutions, Inc. ("MSSI") has filed a Motion to Strike Count Two of Plaintiff's Amended Complaint and a Motion for Summary Judgment on Count Two.  Plaintiff Parco Merged Media Corp. ("Parco") has filed a Partial Motion for Summary Judgment on Count Two of the Amended Complaint.  For the reasons stated below, Defendant's Motion to Strike Count Two of Plaintiff's Amended Complaint is **GRANTED**.  Additionally, Defendant's Motion for Summary Judgment on Count Two is **GRANTED**.  Plaintiff's Partial Motion for Summary Judgment is **DENIED**.

I.  FACTUAL AND PROCEDURAL HISTORY

In July 2002, Parco and MSSI entered into a Licensing and Development Agreement ("License Agreement") in which Parco had exclusive license rights for the use of MSSI's ultra-wideband ("UWB") radio frequency technology[1] in certain healthcare facilities in the United States.  Specifically, Parco was granted an exclusive license to "use, copy, modify, and

---

[1] UWB is a relatively new technology that enables facilities to more efficiently locate equipment, personnel, and patients by using a network of tags, receivers and hubs.

distribute, MSSI's Intellectual Property and to make, have made, use, sell, have sold, and offer for sale, products covered by patents in the MSSI Intellectual Property in the United States in Tier One Facilities and Tier Two Facilities."[2] (License Agreement § 2.1(a).) MSSI would manufacture custom UWB products for Parco to market to the healthcare facilities.

The initial term of the License Agreement was from January 1, 2004 through December 31, 2005. The License Agreement provided for Parco to pay certain royalties to MSSI as sales were made. (License Agreement § 4.2.) Additionally, the License Agreement provided for up to three additional two-year Renewal Terms "if MSSI received minimum cumulative royalties during any prior and current term." (License Agreement § 3.2.) The first Renewal Term would be from January 1, 2006 through December 31, 2007 and required minimum cumulative royalties of $4,500,000.[3]

On January 26, 2006, Parco filed a ten count complaint seeking various relief against MSSI alleging patent infringement, tortious interference, misappropriation of trade secrets, breach of warranty, and a request for an accounting. Additionally, Parco filed a Motion for Preliminary Injunction, a Motion for Expedited Discovery on Count Two of the Complaint, and a Motion for Separate Trial on Count Two and to Expedite Trial and Judgment on Count Two. These motions were intended to address the ninety (90) day timeframe Parco believed it had to cure any default in the contract.

---

[2] MSSI was concerned whether UWB technology could be successfully adapted in the short term to large healthcare facilities. Therefore, the parties distinguished the healthcare facilities by size. Tier One facilities included facilities having between 25 and 299 designated patient beds. Tier Two facilities included facilities having between 300 and 399 designated patient beds. Tier Three facilities include facilities having greater than 400 designated patient beds. Parco's licensing rights with regard to Tier Three facilities would not go into effect until the first Renewal Term of the License Agreement.

[3] Through December 31, 2005, Parco has paid royalties of $8,352.50 to MSSI.

On February 8, 2006, the parties submitted three consent orders resolving each of Parco's motions filed on January 26, 2006. On February 10, 2006, the Court held a short telephonic hearing with counsel requesting clarification of the issues raised in the consent orders. During the conference, counsel for Parco and MSSI agreed that Count Two could be decided on an expedited basis by simply construing the language of the parties' contract. The Court granted the Consent Order on Plaintiff's Motion for Preliminary Injunction ("Preliminary Injunction Consent Order") in which MSSI agreed that it would take no further action in any way purporting to terminate the parties' License Agreement until the Court entered judgment on Count Two. The Court also granted the Consent Order on Plaintiff's Motion for Expedited Discovery on Count Two ("Expedited Discovery Consent Order") in which the parties agreed to expedite discovery relating to Count Two and to submit dispositive motions relating to Count Two by March 10, 2006. The Court denied the Consent Order on Plaintiff's Motion for Separate Trial on Count Two and to Expedite Trial and Judgment on Count Two. Neither party objected to the Court's decision.

On March 7, 2006, Parco filed an Amended Complaint that included additional allegations relating to the doctrine of prevention of performance for Count Two. On March 8, 2006, MSSI filed a Motion to Strike Count Two of the Amended Complaint arguing that Parco violated the Consent Orders by amending the underlying count. On March 10, 2006, MSSI filed a Motion for Summary Judgment on Count Two of the Complaint. On the same day, Parco filed a Motion for Partial Summary Judgment on Count Two of the Amended Complaint. Both parties have responded. These matters are now ripe for determination by the Court.[4]

---

[4] On March 17, 2006, Defendant filed a Motion to Strike Inadmissible Statements arguing that the declaration of Scott A. Cohen contained inadmissible legal conclusions concerning the terms of the License Agreement. The Court finds that Mr. Cohen is not attempting to provide a legal

## II.  LEGAL STANDARDS

**A.  Summary Judgment**

Rule 56(c) provides for summary judgment if the Court, viewing the record as a whole, determines "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c)); *Haulbrook v. Michelin North Amer., Inc.*, 252 F.3d 696, 700 (4th Cir. 2001) (citing *McKinney v. Bd of Trustees of Mayland Cmty. Coll.*, 955 F.3d 924, 928 (4th Cir. 1992) (stating that "summary judgment should be granted only when it is perfectly clear that no issue of material fact exists, and it is not necessary to inquire further into the facts in order to clarify the operation of the law").  In deciding a motion for summary judgment, the Court must view the facts, and inferences to be drawn from the facts, in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).  To defeat summary judgment, the nonmoving party must go beyond the pleadings with affidavits, depositions, interrogatories, or other evidence to show that there is in fact a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  Summary judgment will be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

---

opinion or conclusion regarding the terms of the License Agreement and is merely providing the Court with his understanding of the provisions of the License Agreement.  *Haught v. The Louis Berkman, LLC*, 377 F.Supp.2d 543, 551 (N.D.W.Va. 2005) (portions of employee's Equal Employment Opportunity Commission (EEOC) questionnaire, including references to inappropriate statements allegedly made by supervisor to employee, contained admissible information based on employee's personal knowledge, and questionnaire thus would not be stricken in its entirety under summary judgment rule in Title VII action). Accordingly, Defendant's Motion to Strike Inadmissible Statements Contained in Declaration of Scott A. Cohen is **DENIED**.

### III.  DISCUSSION

**A.  MSSI's Motion to Strike Count Two**[5]

MSSI moves the Court to strike Count Two of the Amended Complaint.  MSSI argues that the Amended Complaint is contrary to the Consent Orders previously entered by the Court.  Additionally, MSSI argues that the Amended Complaint is contrary to the representations Parco has made and that MSSI has taken actions based on these representations.

Parco argues that because MSSI had not filed a responsive pleading, it had "an absolute right" under Federal Rules of Civil Procedure 15 ("Rule 15")[6] to file an amended complaint.  Parco's Amended Complaint amends Count Two by adding new allegations that MSSI, through numerous acts of misconduct, prevented Parco from paying minimum cumulative royalties as outlined in the parties' contract.  Parco has termed the new allegation as the "prevention issue."  Parco argues that it has amended the complaint because Parco previously had a misunderstanding of MSSI's position and "in order to protect its rights under the License Agreement . . . Parco filed its Amended Complaint to directly raise the 'prevention issue' in

---

[5] Parco argues that MSSI has not indicated any procedural basis for the Motion to Strike and a motion to strike under Federal Rules of Civil Procedures 12(f) ("Rule 12(f)") is clearly not appropriate.  The Court agrees that a motion to strike brought under Rule 12(f) is inappropriate.  *See Graff v. Prime Retail, Inc.,* 172 F.Supp.2d 721, 731 (D.Md. 2001) (citing 5A Wright & Miller, *Federal Practice and Procedure* §§ 1382 (2d ed.1990)) (Rule 12(f) motions are disfavored and "should be denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties.").  However, because MSSI has not designated the motion as one falling under Rule 12(f), the Court will not prohibit the motion based on its technical name.  The Court views MSSI's Motion to Strike as an opportunity to consider whether Count Two of the Amended Complaint should be used in ruling on the cross-motions for summary judgment before the Court.  *See Monroe v. Board of Educ. of Town of Wolcott, Connecticut*, 65 F.R.D. 641, 645 (D.C.Conn. 1975) (a motion to strike was not the proper method to challenge affidavits, but the court accepted "the motion as an invitation by the plaintiff to consider whether the record" should be relied upon in deciding the motion for summary judgment).

[6] Rule 15(a) states: "A party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served …"

Count Two." (Parco's Resp. Br. in Opp. to Motion to Strike at 4.)

The Court disagrees with Parco's reasoning. First, MSSI's position or argument has not changed since the initial filing. MSSI has consistently argued that the License Agreement ended on January 1, 2006 when Parco failed to satisfy the minimum cumulative royalty requirement for the first Renewal Term. The Court has been unable to locate any pleading MSSI filed which indicates a change in position, such that Parco should now have a different understanding.

Second, by amending Count Two, Parco has undermined the objectives of the Consent Orders. Parco, through counsel, filed three separate pre-trial motions urging the Court to accelerate the disposition of Count Two. In no uncertain terms, Parco represented to the Court that it wanted Count Two decided as soon as possible and that no discovery would be needed. "The parties are prepared to proceed to judgment on Count Two of the Complaint and do not currently believe that any discovery is necessary for the Court to resolve those issues." (Expedited Discovery Consent Order ¶ 3.) Additionally, the Consent Order states that "[t]he Parties have agreed that Count Two of the Complaint – which involves the interpretation of the parties' contract and which the parties believe can be resolved by cross-motions for summary judgment – should be resolved promptly." (Preliminary Injunction Consent Order ¶ 2.) Unlike Count Two of the original Complaint, the prevention issue contains allegations that cannot be resolved without adequate discovery and extrinsic evidence. Accordingly, if the Court accepted Parco's Amended Complaint, the amended Count Two could not be decided in an expedited manner by simply construing the contract language. The filing of an amended complaint is contrary to the representations Parco made to the Court that Count Two "should be resolved promptly." (*Id.*).

Third, the Court and MSSI have relied on Parco's representations. The Court granted

Parco's motions to expedite judgment on Count Two separate from the other parts of the complaint.  Additionally, the Court agreed to an accelerated schedule in which MSSI's answer and any dispositive motions, specific only to Count Two, would be filed on expedited deadlines.  Additionally, the Court agreed that it would determine the disposition of Count Two quickly to resolve the contract issues.

      MSSI's reliance on Parco's representations is far more extensive.  MSSI was required to file a completely separate answer to Count Two of the Complaint by March 3, 2006.[6]  The Consent Order required cross-motions for summary judgment to be filed on March 10, 2006 and responses filed on March 17, 2006.  Parco filed its Amended Complaint on the evening of March 7, 2006.  This filing was only three days before the deadlines the Court imposed and did not provide enough time for MSSI to have properly addressed the new issues raised in the Amended Complaint within the time frame laid out in the Consent Orders.  More importantly, based on Parco's representations, MSSI entered into a Consent Order in which it agreed not to communicate to any third party that Parco no longer had exclusive licensing rights until the Court entered a judgment on Count Two.  If Parco is allowed to amend Count Two, Count Two could not possible be promptly resolved and MSSI would be bound from conducting its normal business for an indefinite amount of time.

      "The general rule is that a party is bound by the admissions of [its] pleadings."  *Lucas v. Burnley*, 879 F.2d 1240, 1242 (4th Cir. 1989); *See also, Lamonds v. General Motors Corp.*, 34 F.Supp.2d 391, 396 (W.D.Va. 1999) (when lawyers expressly stated to the court that they were relying on one legal theory and the parties and court relied on these representation, the doctrine of judicial admission prohibits inconsistent representation made by counsel).

---

[6] The Court subsequently extended MSSI's deadline to March 8, 2006.

> Representations made in briefs inform opposing parties and the court of concessions, the specific contentions being raised and the facts and laws relied upon to make them. The smooth, efficient working of the judicial process depends heavily upon the assumption that such representations will be made after careful, deliberate evaluation by skilled attorneys who must ultimately accept responsibility for the consequences of their decisions. It goes without saying that one cannot casually cast aside representations, oral or written, in the course of litigation simply because it is convenient to do so . . . a reviewing court may properly consider the representations made in the appellate brief to be binding as a form of judicial estoppel, and decline to address a new legal argument based on a later repudiation of those representations.

*EF Operating Corp v. American Bldgs.,* 993 F.2d 1046, 1050 (3d Cir. 1993). *See In re McNallen*, 62 F.3d 619, 625 (4th Cir. 1995) (when counsel made concessions to the court, he was subsequently barred from arguing a contrary position later).

The Court believes that Parco, by filing the amended complaint, has changed the underlying nature of Count Two. The Consent Orders created an implied agreement between the parties that Count Two, as expressed in the original Complaint, would be resolved promptly and subsequently would not be change.

The Court finds that its inherent authority to manage cases effectively requires that Parco be held to its prior representations and agreement, as embodied in the Consent Orders. *G. Heileman Brewing Co., Inc. v. Joseph Oat Corp.*, 871 F.2d 648, 653 (7th Cir. 1989) ("Inherent authority remains the means by which district judges deal with circumstances not proscribed or specifically addressed by rule or statute, but which must be addressed to promote the just, speedy, and inexpensive determination of every action."); *F.J. Hanshaw Enterprises, Inc. v. Emerald River Development, Inc.*, 244 F.3d 1128, 1136 (9th Cir. 2001) ("Federal courts are vested with inherent powers enabling them to manage their cases and courtrooms effectively and to ensure obedience to their orders.").

Accordingly, MSSI's Motion to strike the amended Count Two is **GRANTED**.

**B. Motion for Summary Judgment**[7]

Both Parco and MSSI have filed summary judgment motions asking the Court to interpret the language of the License Agreement to determine: (1) if the minimum cumulative royalties were required to be paid to enter into the first Renewal Term; and (2) if the License Agreement expired when the minimum cumulative royalties were not paid by the end of the initial Term or was MSSI required to give Parco 90-days notice and an opportunity to cure before terminating the License Agreement. The Court will address each of these issues in turn.[8]

**1. Virginia Rules of Contract Interpretation**

The instant action requires reference to Virginia rules of contract interpretation. (License Agreement § 21). Under Virginia law, courts uphold the intent of the contracting parties as expressed through contractual language. *See Bender-Miller Co. v. Thomwood Farms*, Inc., 211 Va. 585, 588 (1971). Where the parties' intent is clear and contractual language amenable to only one reasonable interpretation, courts are to construe contractual language according to its plain and ordinary meaning. *See Appalachian Power Co. v. Greater Lynchburg Transit Co.*, 236

---

[7] Because the Court has granted MSSI's motion to strike Count Two from the Amended Complaint, Parco's Motion for Summary Judgment on Count Two of the Amended Complaint is **DENIED**. However, because the notice and royalties issues are included in Count Two of the original complaint, the Court will consider Parco's Summary Judgment motion as it relates to the analysis of those remaining issues.

[8] Parco has argued that the Court cannot decide summary judgment on Count Two unless it addresses the prevention issue. In its original Complaint, Parco's essential contention was that they did not pay the minimum cumulative royalties because the royalties were not due until December 31, 2007. Now, Parco argues that they were prevented from paying the minimum cumulative royalties because of MSSI's actions. The Court believes there is a disconnect between the initial arguments in Count Two and the prevention issue Parco raises in the Amended Count Two. Accordingly, it is not necessary that the Court address the prevention issue to decide these cross motions for summary judgment. The Court's ruling here does not bar the assertion of the prevention issue, if applicable, regarding other claims in the Complaint.

Va. 292, 295 (1988). This latter cannon is commonly referred to as the "plain meaning rule," and it is well-established under Virginia rules of contract interpretation. *See id.* "[W]here an agreement is complete on its face, is plain and unambiguous in its terms, the court is not at liberty to search for its meaning beyond the instrument itself." *Berry v. Klinger*, 225 Va. 201, 208 (1983) (quoting *Globe Co. v. Bank of Boston*, 205 Va. 841, 848 (1965)). Even when the "plain meaning" rule renders what some may consider a harsh result, courts are still not at liberty to rewrite the contractual language. *See Dominick v. Vassar*, 235 Va. 295, 300 (1988).

Additionally, courts cannot read into contracts language which will add to or take away from the meaning of the words already contained therein." *Wilson v. Holyfield*, 227 Va. 184,187 (1984); *see also Berry*, 225 Va. at 208 (stating a contract's "meaning is to be gathered from all its associated parts assembled as the unitary expression of the agreement of the parties"). As a result, no word or provision can be rendered meaningless when a reasonable interpretation exists that gives effect to and is consistent with all parts of the contact. *See Wilson,* 227 Va. at 187; *Berry,* 225 Va. at 208.

Both parties have conceded that the contractual language in the License Agreement is clear and unambiguous. This Court has reviewed the License Agreement and agrees that the contractual language is clear and unambiguous. In light of this finding, the Court's inquiry into the parties' contractual intent must be confined solely to the License Agreement. *See Berry*, 225 Va. at 208. "When the terms of the parties' documents are clear and unambiguous, the interpretation of those terms presents a question of law." *Musselman v. Glass Works, L.L.C.*, 533 S.E.2d 919, 920 (Va. 2000) (citing *Pollard & Bagby, Inc. v. Pierce Arrow, L.L.C.*, 258 Va. 524, 528 (1999)); *see Gordonsville Energy, L.P. v. Virginia Elec. & Power Co.*, 257 Va. 344, 352-53 (1999).

**2. Minimum Cumulative Royalties**

Both parties take the position that the pertinent language of the License Agreement is unambiguous. However, each party urges upon the Court one of two alternative contractual interpretations regarding the due date of the minimum cumulative royalties and the termination of the License Agreement.

Under Parco's interpretation, the License Agreement had an Initial Term of two (2) years and automatically entered the first Renewal Term after the end of the Initial Term. Parco additionally argues that the License Agreement requires the payment of the minimum cumulative royalties at the end of the Renewal Term, specifically December 31, 2007. MSSI interprets the License Agreement as only entering the first Renewal Term if Parco paid the minimum cumulative royalties specified in the contract by December 31, 2005.

Section 3.2 of the License Agreement states:

> 3.2    Automatic Renewal. The License shall be renewable for up to three additional terms (each a "Renewal Term," and together with the Initial Term, the "Term") if MSSI receives minimum cumulative Royalties (as defined in Section 4.2 below) during any prior and current term as provided for in this Section. If the amount of Royalties is less than the applicable minimum, Parco shall have the option to pay the difference between the applicable minimum and the Royalties previously paid and thereby renew the Agreement for the applicable Renewal Term. The length of each Renewal Term and the minimum cumulative Royalty payments required to be paid to MSSI are as follows:
>
> | Renewal Term | Length (years) | Cumulative Minimum Royalties |
> |---|---|---|
> | Term 1 | 2 years | $4,500,000 |
> | Term 2 | 2 years | $16,000,000 |
> | Term 3 | 2 years | $22,000,000 |

The Court finds that the Section 3.2 of the License Agreement requires the payment of the minimum cumulative royalties *before* the beginning of the Renewal Term. Specifically, Parco had to pay minimum cumulative royalties of $4.5 million to extend the License Agreement beyond the two-year Initial Term.

The Court finds that Parco's interpretation of the License Agreement is contrary to the plain language of Section 3.2. In support of its interpretation, Parco stresses the significance of the heading, "Automatic Renewal," of Section 3.2. Essentially, Parco argues that because of the heading, the Renewal Terms should be automatic, with no royalty requirement. The Court cannot square this interpretation with Parco's own representations. Parco argues that the minimum cumulative royalties were not required to extend into the first Renewal Term but the $4.5 million would be required at the end of the first Renewal Term to extend the contract into the second Renewal Term. This interpretation is directly contrary to Parco's argument that the heading of Section 3.2 requires automatic renewal. Additionally, the Court is not convinced that Parco has correctly interpreted the meaning of the heading of Section 3.2. The Court interprets the heading of "Automatic Renewal" as creating an automatic renewal when the minimum cumulative royalties have been met. In essence, MSSI could not reject the renewal of the License Agreement if Parco had met the minimum cumulative royalties for that term.

Parco additionally argues that Section 3.2 states that MSSI must receive the minimum cumulative royalties "during any prior and current term." Based only on this phrase, Parco argues that it has the prior and current term, i.e. the initial and first Renewal Term, to pay the minimum cumulative royalties listed under the first Renewal Term. Essentially, Parco is asserting that the first Renewal Term is the current Term. Parco provides no basis for its assumption that the first Renewal Term is the current Term. This interpretation is contrary to the

plain language of "current." If the section of the contract is discussing entering the Renewal Term, the current term would be the term before the Renewal, i.e. the Initial Term.

The Court interprets the phrase "during any prior and current term" as being a cumulative phrase expressing the parties intent that Parco would be required to have provided the minimum cumulative royalties for the prior term as well as the current term to enter into the next Renewal Term. Specifically, if the License Agreement was extended to the first Renewal Term, Parco would have had to have paid the $4.5 million required to extend the first Renewal Term which would be considered part of the $16 million required to extend to the second Renewal Term.

Additionally, the Court finds it important to the interpretation of Section 3.2 that Section 3.3 of the License Agreement provides for "discretionary renewal . . . [n]otwithstanding any failure by Parco to meet the minimum Royalty schedule . . . at the end of the then current Term." (License Agreement § 3.3). This language clearly expresses that the minimum cumulative royalties had to be met to extend the Term and gives MSSI the discretion to renew the contract absent such payment.

The Court is unable to reconcile the plain language of Section 3.2 with Parco's interpretation. Under Parco's interpretation, the minimum cumulative royalty requirement and the need for Renewal Terms are rendered meaningless. If the Renewal Terms were automatically renewed, then there would be no point in having an Initial Term and subsequent Renewal Terms with specific time lengths. Parco's interpretation effectively ignores the minimum cumulative royalty requirement of the contract. The Court must interpret the contract to give effect to all provisions in an agreement. *See e.g., Daugherty v. Diment*, 385 S.E.2d 572, 574 (Va. 1989) ("[T]he court will not treat any work or clause as meaningless if any reasonable interpretation consistent with the other portions of the contract can be ascribed to it"). The Court

13

finds that MSSI's interpretation of the contract is the most plausible and consistent construction of all provisions of the License Agreement.

**2. Contract Termination**

Because the License Agreement was not extended beyond its initial two year term, the Court must now resolve whether MSSI had to take any action to terminate the agreement or whether the agreement expired on its own terms. Under Parco's interpretation, MSSI was required to give notice of termination and allow Parco ninety days to pay the required minimum cumulative royalties. Parco argues that Section 3.6 of the License Agreement addresses the termination of the contract for "Uncured Breach" and accordingly should be applied when the minimum cumulative royalties have not been paid.

MSSI interprets the License Agreement as having expired after the minimum cumulative royalties were not paid. MSSI argues that it was not required to terminate the agreement under Section 3.6 because Parco's failure to pay the minimum cumulative royalties due was not a breach of the agreement and accordingly did not place Parco in default. Accordingly, MSSI argues that Parco had the opportunity to extend the contract by paying the minimum cumulative royalties but was not required.

Section 3.6 of the License Agreement states:

> 3.6 <u>Termination for Uncured Breach</u>. Failure by MSSI or Parco to comply with any of the respective obligations and conditions contained in this Agreement will entitle the other party to give to the party in default written notice specifying the nature of the default and requiring it to cure the default. If a default of this Agreement is not cured within ninety (90) days after the receipt of such notice, the notifying party will be entitle, without prejudice to any of its other rights conferred on it by this Agreement to terminate this Agreement by giving written notice of such termination, such termination to take effect immediately. The right of either party to terminate this Agreement shall not be

>affected in any way by its waiver, or failure to take action with respect to, any previous default.

The Court finds that under the contractual language, Parco was not in default under the License Agreement and no breach of contract had occurred. Therefore, Section 3.6 of the License Agreement is not applicable. A breach of contract is defined as a "violation of a contractual obligation by failing to perform one's own promise, by repudiating it, or by interfering with another party's performance." (Black's Law Dictionary, 8th ed. 2004). Parco had the *opportunity* to extend the License Agreement into Renewal Terms. This opportunity to extend was not a promise nor was it a duty imposed by the contract. Had Parco chosen not to extend the License Agreement, MSSI would not have been able to bring an action arguing for breach of contract for such a conditional provision. Accordingly, Parco cannot argue that it was an obligation or condition that would constitute a breach as considered in Section 3.6 of the License Agreement.

The Court finds that Parco failed to pay the minimum cumulative royalties to extend the License Agreement. Accordingly, Parco failed to take advantage of the opportunity under Section 3.2 of the License Agreement to extend the License Agreement into the first Renewal Term. Therefore, the License Agreement expired on December 31, 2005. "An expiration is the "natural end or conclusion to a contract or lease based solely on the passage of time." *In re Turner*, 326 B.R. 563, 575 (W.D. Pa. 2005). Accordingly, no notice was required under Section 3.6 of the License Agreement to allow Parco to pay the minimum cumulative royalties.[9]

---

[9] Additionally, the Court finds that even if Parco was in default under the Loan Agreement, MSSI would not have been required to give notice. Section 3.6 of the License Agreement provides that "failure by MSSI or Parco to comply . . . will *entitle* the other party to give to the party in default written notice specifying the nature of the default and requiring it to cure the default." License Agreement § 3.6. There is nothing in the language that would have *required* MSSI to give Parco written notice of the default or the opportunity to cure the default.

However, that is not the end of the Court's inquiry. Section 3.2 of the License Agreement provides that "[i]f the amount of Royalties is less than the applicable minimum, Parco shall have the option to pay the difference between the applicable minimum and the Royalties previously paid and thereby renew the Agreement for the applicable Renewal Term." (License Agreement § 3.2). In a letter dated on January 6, 2006, MSSI informed Parco of its intent to end the License Agreement based on failure to pay the minimum cumulative royalties. In the January 6, 2006 letter, MSSI granted Parco one week to pay the difference of $4,491,647.50 to renew the License Agreement into the first Renewal Term.[10] In its response, Parco asserted the belief that minimum cumulative royalties were not due and that the first Renewal Term had already started. Now that Parco is aware of the correct contractual interpretation, as a matter of equity, MSSI may provide Parco a reasonable time frame to pay the difference between the applicable minimum cumulative royalties required and the royalties Parco has previously paid.

## IV.  CONCLUSION

Reviewing the License Agreement, the Court finds a clear and unambiguous contractual intent to require minimum cumulative royalties be paid before the License Agreement was extended into the first Renewal Term. Therefore, Parco has failed to enter into the first Renewal Term and the contract has expired. However, according to the contractual language, Parco shall have the option to pay the difference to renew the License Agreement.

---

[10] In the January 6, 2006 letter, MSSI states that Parco was required to pay the difference before the end of the Initial Term, specifically December 31, 2005. "Nevertheless, MSSI is willing to allow Parco until Friday, January 13th at 4:00pm to pay such difference." The Court is not determining whether Parco is correct in asserting that the difference had to be paid before the end of the Initial Term.

16

For the foregoing reason, Defendant's Motion to Strike Count Two of the Amended Complaint is **GRANTED** and Plaintiff's Amended Complaint is hereby **STRICKEN** from the record. Defendant's Motion for Summary Judgment on Count Two is **GRANTED**. Plaintiff's Motion for Summary Judgment on Count Two of the Amended Complaint is **DENIED**. Defendant's Motion to Strike Inadmissible Statements Contained in Declaration of Scott A. Cohen is **DENIED**.

The Court **DIRECTS** the Clerk to send copies of this Memorandum Opinion and Order to counsel of record.

**IT IS SO ORDERED.**

/s/
RAYMOND A. JACKSON
UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
April 21, 2006